UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN M. ALDINI,

                Plaintiff,                              Case No. 12-13641

v.                                            Paul D. Borman
                                                United States District Judge

KROGER COMPANY OF MICHIGAN,

                Defendant.
_____/

OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 10)

      This action arises from Plaintiff's allegations of discrimination, retaliation and harassment by his employer.  Plaintiff John M. Aldini ("Plaintiff") originally filed his Complaint in Macomb County Circuit Court on May 29, 2012.  (ECF No. 1).  The Defendant, Kroger Company of Michigan ("Defendant"), removed the action to this Court on August 16, 2012.

      Now before the Court is Defendant's Motion for Summary Judgment.  (ECF No. 10).  A hearing on this matter was held February 13, 2014.  For the reasons set forth below, the Court will grant Defendant's Motion for Summary Judgment.

I. BACKGROUND

A.     Plaintiff's Employment with Defendant

      Plaintiff began working for Defendant on June 9, 1988 as a meat clerk.  (Def.'s Ex. A, Employee Profile).  Plaintiff has worked at multiple Kroger stores since 1988 but has been a meat clerk at Store No. 455 in Roseville, Michigan since 2007.  (Def.'s Ex. B, Pl's Dep. at 7; Compl. ¶

9).[1]  During his more than 25 year employment with Kroger, Plaintiff has always been employed as a meat clerk except at some point when he was a seafood manager for three or four years.  (Pl.'s Dep. at 8, 10-11).

Patricia Trongo ("Trongo") has been the head of the meat department at Store 455 since it opened in 2007.  (Ex. H, Trongo Dep. at 6).  Trongo oversees the operation of both the seafood and the meat department.  (*Id*. at 20).  Trongo, however, is not a member of management and has no ability to hire, fire or discipline any employee.  (*Id*. at 102-03).

Jeffrey Morley ("Morley") was employed as the Store Manager of Store No. 455 from October 2008 until January 2013.  (Ex. D., Morley Dep. 8/9/13, at 7).

Defendant maintains a "Job Description and Physical Demands Analysis" for Plaintiff's meat clerk position.  (Ex. E, Job Description).  The Job Description outlines the "essential functions" of the position, including (among other things): "Unload meat from delivery truck onto a cart and moving it to the freezer and display area"; "[s]tock the freezer with boxes of various meats and display cases with lunch meats, chickens, etc.; [s]et meat counter with various cut meats and other products".  (Ex. E, Job Description).  The Job Description also states that all duties "require standing and most require walking" for an estimated four to eight hours (with a maximum continuous time of four hours).  (*Id*.).  Further, a meat clerk is charged with lifting and carrying all types of meat: notably a meat clerk lifts more than 10 to 25 pounds hourly, 26 to 75 pounds daily, and 76 to 100 pounds weekly.  (*Id*.).  Finally, the Job Description sets forth that a meat clerk will be "bending/squatting/kneeling" daily as well as "reaching into the display case, stocking lunchmeats" hourly, an action that involves moving items that weigh more than 10 pounds on average.  (*Id*.).

---

[1] All exhibits are attached to Defendant's Brief unless otherwise noted.

2

Plaintiff testified that as a meat clerk he is expected to "[u]nload trucks, wrap, wait on customers, wrap/weigh [product]". (Pl.'s Dep. at 13:20-21). Plaintiff explained that he is required to unload trucks "every day" and a "great deal" of his day is spent "pushing and pulling big loads". (Pl.'s Dep. at 14). Plaintiff also testified that he spends the better part of his day stocking items. (Pl.'s Dep. at 22).

B.     Union and Collective Bargaining Agreement

Plaintiff's terms and conditions of employment are governed by a collective bargaining agreement ("CBA") between Defendant and the United Food and Commercial Workers, Local 876 ("Union"). (Ex. F, CBA). This CBA covers all of the employees who work in the meat and seafood departments in Defendant's stores. (CBA at 21-24). The CBA provides procedures by which an employee can protest a work schedule (CBA at 7) and also outlines procedures governing seniority, promotions and job transfers (CBA at 21-24). All other departments in Defendant's stores are covered by a different CBA. (Ex. G., Williams Dep. at 94-95).

C.     Plaintiff's Claims of Disability

Plaintiff alleges that he has been "diagnosed with various medical conditions" which are disabling and "include, but are not necessarily limited to, chest pains, symptoms of emotional distress and issues due to medical conditions, including a heel spur in his foot." (Compl. ¶ 7). Plaintiff also states that as recently as January 19, 2011 a doctor diagnosed him as having "chronic plantar fasciitis" and ordered that he limit his lifting to less than 20 pounds and to sit when the pain is unbearable. (Pl.'s Br., Ex. 1, 1/19/11 Note). This most current doctor's note also states that

Plaintiff's condition "can be managed but will never get better."[2]  (*Id.*).  Plaintiff further states that

his ankle and foot pain "substantially limit my major life activities."  (Pl.'s Aff. ¶ 2).  Plaintiff states

that he is substantially limited in performing the following activities: the ability to sleep, his ability

to take care of his house (including cleaning, laundry and cooking), the ability to drive a car, the

ability to go shopping, attend sporting events or church, and his ability to socialize.  (*Id.* ¶ 3).

Plaintiff also states that the pain "limits my ability to engage in these activities approximately six

out of seven days a week."  (*Id.*).

D.     Plaintiff's return to Work after Foot Surgery, June 2010

        Plaintiff had foot surgery in May, 2010 and was on a medical leave of absence from May 16,

2010 until June 6, 2010.  (Ex. I, 6/4/10 Note; Pl.'s Dep. at 31).  Plaintiff returned to work on June

6, 2010 and provided Defendant with a doctor's note entitled, "Patient Disability Statement", which

provided that Plaintiff was disabled from May 16, 2010 until June 5, 2010 but that as of June 6, 2010

he could return to work "without restrictions".  (6/4/10 Note).

        On June 14, 2010, one week after his return from leave, Plaintiff provided the store manager,

Morley, with a second doctor's note also entitled "Disability Statement", that provided "no bending,

stooping or lifting over ___ lbs." and "Other restrictions PATIENT NEEDS A 15 MIN BREAK

EVERY 2 HRS AND NO LIFTING OVER 25 LBS".  (Ex. J, 6/14/10 Note).

        Upon receipt of this second doctor's note, Morley told Plaintiff that he "doesn't

accommodate."  (Pl.'s Dep. at 31).  Morley confirmed this conversation testifying that he told

Plaintiff that "he cannot work with these restrictions and that [he] would get in touch with Human

---

[2] The 1/19/11 doctor's note and the 6/28/10 doctor's note that Plaintiff attached as part of his Exhibit 1 were never submitted to Defendant and there is nothing in the record indicating that Defendant had any knowledge of these doctor's notes prior to this lawsuit.

4

Resources." (Morley Dep. 8/15/13 at 18). Morley explained that he told Plaintiff he could not work

with those restrictions "because his job entails lifting over 25 pounds." (*Id*. at 19). Morley then

faxed the doctor's note to Human Resources and was told they would be in touch, however, Morley

did not hear from them again regarding this note. (*Id*. at 20).

After being told that his restrictions could not be accommodated by Morley, Plaintiff then

returned to his doctor the same day, and told his doctor his work wasn't cooperating. (Pl's Dep. at

32). Plaintiff testified that his doctor stated, "Then fine. You can go back to work no restrictions."

(Pl.'s Dep. at 32:24-25). Plaintiff then stated:

> A: Well, I said, "Doctor, what do we do?" He says, "I'll just send you back to work.
> You're able to work, you go back to work."
>
> Q: And so he gave you the note.
>
> A: Yes.

(Pl.'s Dep. at 33:8-12). This third doctor's note cleared Plaintiff for work "without restrictions."

(Ex. K, 6/15/10 Note). Plaintiff provided this note to Morley the next day, on June 15, 2010. (Pl.'s

Dep. 33; Morley Dep. 8/15/13 at 21-22).

Morley testified that after June 15, 2010 he understood that Plaintiff had no restrictions on

his ability to work. (Morley Dep. 8/15/10 at 25).

Plaintiff testified that after giving Defendant a doctor's note that lifted the initial restrictions,

he never provided anyone who works for Defendant with a doctor's note indicating a he required

a lift restriction or that otherwise restricted his ability to work. (Pl.'s Dep. at 18-19). Plaintiff

explained that he did not request another accommodation because he believed that Defendant would

not allow him to work. (*Id*.).

During Plaintiff's deposition, Plaintiff explicitly requested an accommodation from Defendant of a "10 pound lift [restriction] and sit when needed to sit." (*Id*. at 19).

E.      EEOC Charges

In 2011, Plaintiff filed two charges with the United States Equal Employment Opportunity Commission ("EEOC"). The first charge, filed on February 8, 2011, states that

> On or about February 2010 and as recently as August 2, 2010, I have provided my Supervisor with requests for reasonable accommodation. I was told at that time they would not accommodate me and if I needed restrictions I could not work. Since that time I have continued to work in increased pain.

(Ex. M, 2/8/11 EEOC).[3] On August 8, 2011, Plaintiff filed a second charge with the EEOC stating:

> When my requests for reasonable accommodation were denied and I was forced to work in pain I filed a charge with the EEOC on 2/8/11.
>
> Since I filed by charge, I have been harassed continuously by my supervisor and management. My continued requests for reasonable accommodation including a recent request for a transfer to another location have been denied forcing me to work in pain.

(Ex. M, 8/8/11 EEOC).[4]

F.      Plaintiff's Claims of Harassment and Retaliation

Plaintiff claims that he suffered harassment from the head of the meat department, Patricia Trongo, "from day one" of working with her (as early as 2008). (Pl.'s Dep. at 41). Plaintiff explained the harassment he suffered by testifying that Trongo repeatedly told him that "this is your

---

[3] The Court notes that the 2/8/11 EEOC charge is directly contradicted by Plaintiff's testimony that he only sought an accommodation once, on June 14, 2010. There is nothing in the record that Plaintiff requested any accommodation in February 2010 or on August 2, 2010.

[4] The transfer referred to in this EEOC charge relates to Plaintiff request to transfer to a position in Store No. 455 in Grosse Pointe in a different classification (Bistro Manager) for which he was ineligible to sign the bid pursuant to the terms of the CBA. (Williams Dep. at 46-47; Pl.'s Dep. at 71, "I can't transfer. Legally I can't transfer".).

counter" and "you don't know your job". (Pl.'s Dep. at 57-58, 86). Plaintiff stated he found those comments to be "bothersome." (*Id.* at 58). Plaintiff also claimed that he was blamed for putting stickers on Trongo's jacket, that Trongo left him a to-do list every night of tasks that he needed to complete, and that Trongo spoke "rudely" to him. (*Id.* at 60, 77, 87). Plaintiff also testified that he was harassed by Trongo because she scheduled him for later shifts and he was entitled to earlier shifts because of his seniority. (Pl.'s Dep. at 39-40). Plaintiff complained to his union about the scheduling. (Pl.'s Dep. at 45-46). Morley also testified that Plaintiff had complained to him regarding his scheduling as early as 2009. (Pl.'s Dep. at 47; Morley Dep. 8/15/13 at 46). Plaintiff also complained to Telicia Williams, a human resource coordinator, about his scheduling. (Williams Dep. at 35-36). Morley, Trongo, and Williams all testified that the schedule was deemed to be written according to the CBA and Plaintiff's claims were without merit. (Williams Dep. at 35-45; Morley Dep. 8/15/13 at 47-52; Trongo Dep. at 64-65, 109-113). Plaintiff could not work the shifts he requested because he could not operate certain equipment. (Trongo Dep. at 64-65, 109-113; Morley Dep. 8/15/13 at 47-52; Williams Dep. at 35-45). Further, attempts to train Plaintiff on this equipment had not been fruitful. (Trongo Dep. at 64-65, 109-113; Morley Dep. 8/15/13 at 47-52; Williams Dep. at 35-45). There has also been an attempt to have Plaintiff open the seafood counter so he could get his requested shifts, however, Plaintiff could not successfully complete the required tasks despite completing a one week training for the position. (Morley Dep. 8/15/13 at 49-52; Trongo Dep. at 109-113; Williams Dep. at 35-45).

Plaintiff complained to Defendant of harassment around June 11, 2012. (Pl.'s Ex. 9, 6/11/12 Email). Plaintiff complained that in May 2012, Trongo told him that "they would get him and take care of me". (*Id.*). Plaintiff also complained that Trongo came in early in the morning and "messes

up the cooler so it looks like [Plaintiff] does nothing on the nights he closes." (*Id*.).  Plaintiff further claimed that on May 27, 2012, Trongo swore at him when he could not find ribs in the walk in cooler.  (*Id*.).  Finally, Plaintiff claimed that on an unknown date, Morley and Trongo "cornered him in the department accusing him of selling outdated/contaminated meat. They were both swearing at him and threating [sic] his schedule."  (*Id*.).

Defendant assigned human resource coordinator, Telicia Williams, to investigate Plaintiff's claims.  (*Id*.).  Williams interviewed Plaintiff's coworker Kriss Maraman.  (William's Dep. at 58; Ex. 9, Interview with Maraman).  Maraman stated in his interview that Trongo picked on Plaintiff and another employee Chris Carpenter.  (Ex. 9).  Maraman also stated that Trongo treated Plaintiff with disrespect and she "does not like him and she tries to harass him anyway she can get away with it ... She claims [Plaintiff] does not have a problem he just doing stuff to get out of working.  When he is working she orders a pile of stuff for him to work...she likes to intimidate and belittle people." (*Id*.).  Maraman noted that he had "had a couple of incidents with [Trongo] myself."  (*Id*.).

Williams also interviewed Trongo who denied allegations of yelling or screaming at Plaintiff. (Williams Dep. at 77-78).  Morley had one conversation with Williams regarding Plaintiff's claims of harassment but did not remember the conversation, nor did he remember ever speaking to any one else including Plaintiff regarding the claims of harassment.  (Morley Dep. 8/15/13 at 56-57). Williams completed the investigation and submitted her notes to her supervisor and did not know of anything that came of the investigation.  (Williams Dep. at 83).

Williams further testified that some time in late 2012 Plaintiff complained to her that he did not want to work with Trongo any more, but he never put that request in writing or mentioned it thereafter.  (*Id*. at 86-88).

G.     Plaintiff continued to work for Defendant

At the time of the hearing on this matter Plaintiff was still employed by Defendant as a meat clerk in Store No. 455.  Plaintiff claimed that his alleged disability affected his ability to work because he had a hard time doing the heavy lifting.  (Pl.'s Dep. at 13).  When asked if there were any meat clerk duties that he could not perform, Plaintiff stated that he only that he is "having a very hard time lifting, carrying, moving."  (*Id.*).  Plaintiff was asked a second time if there was anything he was "unable to perform," he responded again by stating that he "finds it harder to perform by lifting heavies."  (Pl.'s Dep. at 14).  Plaintiff testified that he spends around 3 or 4 hours unloading trucks and his normal shifts are 8 hours long.  (Pl.'s Dep. at 22, 26).

H.     Current Lawsuit

In May 2012, Plaintiff filed the current lawsuit in state court against Defendant alleging that Defendant had failed to accommodate his disability and that Plaintiff was harassed and retaliated against by Defendant for requesting an accommodation and for filing charges with the EEOC. Thereafter, Defendant removed the state court action to this Court.  (ECF No. 1).

## II. STANDARD OF REVIEW

Defendant has moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact." *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality"

10

demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

### III. ANALYSIS

Pursuant to the ADA, an employer may not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a); *Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). "The ADA defines 'discriminate' to include the failure to provide reasonable accommodation to an otherwise qualified individual with a disability, unless doing so would impose an undue hardship on the employer's business." *Keith*, 703 F.3d at 923 (citing 42 U.S.C. § 12112(b)(5)). "An 'otherwise qualified individual' is one who 'with or without accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) (quoting 42 U.S.C. § 12111(8)).

The Sixth Circuit has held that the ADA and Michigan's PWDCRA "substantially mirror" each other. *Donald v. Sybra, Inc*., 667 F.3d 757, 764 (6th Cir. 2012). As a result, "claims under both statutes are generally analyzed identically." *Steward v. New Chrysler*, 415 F. App'x 632, 641 (6th Cir. 2011). Accordingly, the Court will consider the arguments under the ADA and PWDCRA together and only address the PWDCRA claim separately when the standards differs from the ADA.

A.      Reasonable Accommodation Claims

Plaintiff claims in his Complaint that Defendant violated the ADA and the PWDCRA when Defendant failed to accommodate his disability by allowing Plaintiff the reasonable accommodation of sitting when needed and not engaging in any heavy lifting. (Compl. ¶¶ 13, 16, 20, & 23). Defendant contends that Plaintiff's claims should be dismissed because he cannot establish a *prima*

11

*facie* case of failure to accommodate under either statute.

To establish a *prima facie* case of failure to accommodate under the ADA or PWDCRA, a plaintiff must show that: 1) he is disabled within the meaning of the act, 2) he is otherwise qualified for the position, with or without a reasonable accommodation, 3) his employer knew or had reason to know about his disability, 4) he requested an accommodation, and 5) the employer failed to provide the reasonable accommodation. *Johnson v. Cleveland City School Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). Once a plaintiff establishes these elements, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Id.* at 983.

1.   Plaintiff's Disability

Defendant claims that Plaintiff cannot maintain a *prima facie* case because he cannot establish as a threshold matter that he is disabled within the meaning of the act. Plaintiff contends that he has established that there is at least a genuine issue of material fact regarding whether he is disabled because he testified in his deposition and through affidavit that he is in extreme pain at work and that many of his major life activities have been affected by the pain he suffers from his foot condition.

A disability, as defined by the ADA, means:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment ...[5]

---

[5] To the extent Plaintiff asserted a claim that Defendant "regarded Plaintiff as disabled" - Plaintiff abandons this claim by failing to respond to Defendant's argument that it did not regard Plaintiff as disabled. Plaintiff also failed to address this argument at the hearing. The Court of

42 U.S.C. § 12102(1) (2009). Similarly, the PWDCRA defines disability as

> [a] determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position ..."

MICH. COMP. LAWS § 37.1103(d)(i)(A).

Defendant argues extensively and points to a multitude of cases to support its argument that Plaintiff cannot carry his burden in showing that he is disabled. However, the Court notes that Defendant has failed to recognize the ADA Amendment Act of 2008 ("AAA"). "To broaden the definition of 'disability,' Congress passed the [AAA], which became effective on January 1, 2009". *Donald*, 667 F.3d at 764. While these amendments are not retroactive, in the instant case all of the alleged conduct occurred after January 1, 2009. *Id.* The AAA reinstates the "broad protection" provided under the ADA and rejects the EEOC ADA regulations that defined the term "substantially limits" as "significantly restricted" as expressing too high a standard. *See* Pub. L. 110-325, Sept. 25, 2008, 122 Stat. 3553. Further, the AAA, rejects the Supreme Court's previous standard that:

> the terms "substantially" and "major" in the definition of disability under the ADA need to be interpreted strictly to create a demanding standard for qualifying as disabled, and that to be substantially limited in performing a major life activity under the ADA an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's lives ...

*Id.* (omitting internal quotation marks, referring to *Toyota Motor Mfg, Ky., Inc. v. Williams*, 534 U.S. 184 (2002)). Additionally, the AAA conveyed the congressional intent that "the primary object of

---

Appeals for the Sixth Circuit has made clear that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases). Therefore, the Court shall not address this issue.

13

attention in cases brought under the ADA, should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis ..." (*Id*.).

As amended, the ADA states, "[r]ules of construction regarding the definition of disability" which set forth that the "definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter", the term "'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008" and also that an "impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4). The Court notes, that because these amendments are not applied retroactively there is a dearth of case law interpreting and applying the more expansive standard. However, it is clear that to the extent that the AAA specifically rejected the more strict and narrow standards set forth in *Sutton v. United Air Lines, Inc*., 527 U.S. 471 (1999) and *Toyota Motor*, 534 U.S. 184, the Court cannot rely upon decisions that rely upon those same rejected standards.[6]

Defendant argues that Plaintiff is not substantially limited in any major life function because he has testified that he can and still does perform his job as a meat clerk including lifting "heavies", pushing and pulling more than 10 pounds regularly and taking no breaks beyond those provided.

---

[6] Further, the Court notes that generally the EEOC regulations interpreting the ADA are presumed valid and can be relied upon by a court. *Keith*, 703 F.3d at 925. However, the EEOC regulations reflecting the changes set forth in the AAA regarding disability and defining major life functions did not become effective until May 24, 2011. *See* 76 FR 16978-01, 2011 WL 1060575, Regulations to Implement the Equal Employment Provisions of the ADA, as Amended (Mar. 25, 2011). Therefore, the EEOC regulations that were applicable at the time of Plaintiff's first request for accommodation (June 14, 2010) contradicted the amended ADA. Accordingly, the Court does not rely upon the regulations regarding "disability" and "major life functions" effective at the time Plaintiff claims he initially requested an accommodation.

14

(*See* Pl.'s Dep. at 14-16, 37-38, 113).  For this proposition, Defendant cites only to cases that rely upon the standards set forth in *Toyota Motor* and *Sutton*.  Plaintiff relies upon his own testimony in his deposition and affidavit that he is in extreme pain while working and that many of his major life functions are substantially limited to argue that he is disabled within the meaning of the acts.

The ADA defines a major life activity as "caring for oneself, performing manual tasks, seeing, hearing eating, walking, standing, lifting, bending, speaking, breathing...and working."  42 U.S.C. § 12102(2)(A).  The ADA further states that the definition of "substantially limits" should be interpreted consistently with the findings and purpose of the AAA and that an "impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."  42 U.S.C. § 12102(4).

Defendant has failed to set forth any case law or argument that does not directly rely upon specifically rejected standards.  Plaintiff has testified that he can only accomplish his job in pain and has come forth with an affidavit attesting to the multiple areas of his life that are "substantially limited", including sleep, caring for himself and socializing.  Viewing the facts in a light most favorable to Plaintiff and under the new broadened scope of the ADA, the Court finds that a genuine issue of material fact exists as to whether Plaintiff is "disabled" within the meaning of the Act.

2.     "Otherwise qualified"

Defendant also argues that Plaintiff's claims fail because he is not "otherwise qualified" for the position of meat clerk because he cannot perform the essential functions of the position with or without a reasonable accommodation.  Plaintiff argues that there are genuine issues of material fact regarding whether the ability to lift more than 10 pounds or 20 pounds is an essential function of the meat clerk position.

15

"As defined by the statute, an individual is 'otherwise qualified' if he or she can perform the 'essential functions' of the job with or without a reasonable accommodation." *Keith v. County of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013) (citing 42 U.S.C. § 12111(8)). "To provide a reasonable accommodation, an employer may be required to modify the responsibilities of a disabled employee's existing job or transfer the employee to a vacant position with different responsibilities." *Rorrer*, 743 F.3d at 1039 (citing 29 C.F.R. § 1630.2(o); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)). Where an employee seeks to stay in his or her current position,

> the term reasonable accommodation means: "Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position [to stay in the position]." 29 C.F.R. § 1630.2(o). A suggestion is not reasonable if it requires eliminating an "essential" function of the job. *Id.*; *see also* 42 U.S.C. § 12111(8).

*Rorrer*, 743 F.3d at 1039. The ADA states that "consideration shall be given to the employer's judgment as to what functions of the job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith*, 703 F.3d. at 918.

The regulations set forth that "the term 'essential functions' does include the marginal functions of the position." *Keith*, 703 F.3d. at 925 (citation omitted). Basically, a job function is essential "if its removal would 'fundamentally alter' the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001) (citation omitted). A job function can be considered "essential" for any number of reasons including: (1) "because the reason the position exists is to perform that function", (2) "because of the limited number of employees available among whom the performance

16

of that job function can be distributed, and (3) the function might be highly specialized.  *Id.*, citing

29 C.F.R. § 1630.2(n)(2).  "Whether a function is essential is evaluated on a case-by-case basis by

examining a number of factors."  *Rorrer*, 743 F.3d at 1039 (quoting *D'Angelo v. ConAgra Foods,*

*Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005)).  The Sixth Circuit has set forth seven factors a court

should consider when evaluating whether a job function is essential: (1) the employer's judgment

as to which functions are essential, (2) written job descriptions prepared before interviewing

applicants for the job, (3) the amount of time spent on the job performing the function, (4) the

consequences of not requiring the person to perform the function, (5) the terms of a collective

bargaining agreements, (6) work experience of past incumbents in similar jobs, and (7) the current

work experience of incumbents in similar jobs.  *Id.* (citing 42 U.S.C. § 12111(8) and 29 C.F.R. §

1630.2(n)(3)(iii)-(iv)); *see also Keith*, 703 F.3d 925-26, (relying on same).[7]

    "At the summary judgment stage, the employer's judgment [regarding what qualifies as an

'essential function'] will not be dispositive on whether a function is essential when evidence on the

issue is 'mixed'" *Rorrer*, 743 F.3d at 1039 (citing *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th

Cir. 2012) and *Keith*, 703 F.3d at 926).  Additionally, a written job description is not dispositive on

the issue of whether a job function is "essential".  *Id.* at 1039-40.  The Sixth Circuit has found that

"[t]estimony from the plaintiff's supervisor that a job function is actually marginal may effectively

---

[7] As explained *infra*, certain EEOC regulations that were in effect at the time of Plaintiff submitted his first doctor's note to Defendant contradicted the AAA.  In the recent decisions of *Keith* and *Rorrer*, the Sixth Circuit relied upon 29 C.F.R. §§ 1630.2(n), (o) regarding essential job functions.  While both of these decisions do not implicate the AAA because the termination or protected conduct predated the effective date of the AAA, the particular regulations relied upon by the Sixth Circuit regarding essential job functions were not altered in any relevant way by the recent amendments to the ADA.  *See* 76 F.R. 16978-01 at *16986 (29 C.F.R. § 1630.2(o) added subsection (4) and eliminated use of the term "qualified individual with disability", while 29 C.F.R. § 1630.2(n) was not altered).

rebut a written description that states a job function is essential." *Id.* at 1040 (citation omitted).

In the current action, Plaintiff appears to assert that he cannot lift more than 20 pounds (although in his deposition he specifically requests a restriction such that he cannot lift more than 10 pounds) and that he needs to sit when the pain becomes unbearable. Defendant argues that lifting more than 10 or 20 pounds is an essential function of a meat clerk and relies upon its written description of the meat clerk position and also Plaintiff's own testimony. Specifically, Defendant's written description of meat clerk specifically states that an essential job function of a meat clerk is the ability to unload delivery trucks onto carts and move the carts to the freezer and display areas and stock the freezer and display case with product. (Ex. E, at 1). Defendant additionally notes that the position requires lifting 26-76 pounds on a daily basis and lifting 11-25 pounds on an hourly basis. (*Id.*, at 2). Plaintiff testified that he is required to unload trucks "every day" and a "great deal" of his day is spent "pushing and pulling big loads". (Pl.'s Dep. at 14). Plaintiff also testified that he spends the better part of his day stocking items. (Pl.'s Dep. at 22). Further, Plaintiff stated that if he was allowed a 10 pound lifting restriction he would be unable to unload the trucks or stock the shelves. (*Id.* 21). Plaintiff also testified that those two tasks take up the "better part" of his eight hour shift. (*Id.* 22).

The Court recognizes that the written description of the position and some of Plaintiff's own testimony supports a conclusion that lifting more than 10 or 20 pounds is an "essential" function of a meat clerk. However, a written description or an employer's opinion on what constitutes an essential function of a position is not dispositive of the issue, nor are those particular factors to be given "deference" by the Court. *See Rorrer*, 743 F.3d at 1039-40. Moreover, there is conflicting testimony regarding the amount of time a meat clerk spends lifting or moving items of more than 10 or 20 pounds. While Plaintiff claimed that a "great deal" of his time was spent lifting or pushing

and pulling heavy loads, his supervisor, Trongo, testified that Plaintiff spent a mere 10% of his day unloading trucks and described his position as a "clerk job". (Trongo Dep. at 35-36). This testimony from a supervisor effectively rebuts Defendant's written job description. *See Rorrer*, 743 F.3d at 1040.

Additionally, as to the consequences of not requiring a person to lift items of 10 or 20 pounds, Trongo also testified that "eight or nine times out of ten" Plaintiff would leave product on the pallet for other workers to unload to avoid heavy lifting. (Trongo Dep. at 35-36). Trongo also testified that she, herself, opens boxes of product when they are too heavy for her to lift and unloads the product in smaller, lighter portions and has instructed Plaintiff to do the same. (*Id*. at 29-30). Morley, the former store manager, also testified that when Plaintiff told him he was having problems unloading the truck Morley advised Plaintiff that "if there was two clods of meat, open up the box and take one out at a time instead of two clods of meat." (Morley Dep. 8/15/13 at 33:6-7). Trongo further stated that Plaintiff can ask other meat department workers for help unloading items off the truck. (Trongo Dep. at 30; *see also* Morley Dep. 8/15/13 at 30, 34-37, testifying he instructed Trongo three times that if anyone needed help "not specifically John" that "you guys should work together as a team."). This testimony could lead a reasonable juror to find that Plaintiff and others do not lift heavy items on a daily or hourly basis, and that there are no severe consequences for not being able to lift or unload the trucks as Plaintiff and others can receive help from coworkers in the department and break down the boxes into smaller, lighter units.

Taking all of the testimony and evidence in a light most favorable to Plaintiff, the Court finds that there are clear questions of fact regarding whether lifting more than 10 or 20 pounds constitutes an "essential" job function for a meat clerk.

19

3.      Request for an Accommodation

Defendant also argues that Plaintiff cannot set forth a *prima facie* case of failure to accommodate under the ADA or PWDCRA because Plaintiff never formally requested an accommodation from Defendant.  When a disabled employee does not propose an accommodation, the "failure to accommodate" claim must fail.  *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 883 (6th Cir. 1996) (upholding summary judgment for a defendant because the plaintiff "never requested any accommodation fro the defendant" and "testified several times that she was physically capable of performing the [job]".)

There is no dispute that Plaintiff requested an accommodation from Defendant on June 14, 2010 through a doctor's note that set forth Plaintiff's certain physical restrictions.  It is also equally undisputed that Plaintiff then retracted that request 24 hours later on June 15, 2010 with a note stating he was cleared for work with no restrictions.  Plaintiff explicitly testified that after June 15, 2010 he never provided Defendant with any other doctor notes containing restrictions on his ability to work.  (Pl.'s Dep. at 18-19).  Plaintiff further testified that he never requested another accommodation from Defendant.[8]  (Pl.'s Dep. at 16-17).  Defendant argues that these facts establish Plaintiff "has not requested an accommodation, [and] Kroger's duty to accommodate was never triggered."  (Def.'s Br. at 18).

Plaintiff argues that he did request a reasonable accommodation from Defendant by giving Defendant the June 14, 2010 doctor's note which contained restrictions and thereafter told Morley he was having problem unloading trucks.  Plaintiff also argues that he sought an accommodation by

---

[8] Plaintiff does not attempt to argue that Plaintiff's request to transfer to Store No. 455 in Grosse Pointe constituted a request for a reasonable accommodation as Plaintiff was ineligible to sign the bid for that position (which was as a different classification) because of the terms of the CBA.  (Williams Dep. at 46-47; Pl.'s Dep. at 71, "I can't transfer.  Legally I can't transfer".).

filing two EEOC charges in 2011. Plaintiff further contends that a May 21, 2012 letter sent by his lawyer to Defendant constituted a request for an accommodation. (Pl.'s Br. at 7-8; Pl.'s Ex. 8, 5/21/12 Letter). In the May 21, 2012 letter, Plaintiff's attorney advised Defendant that Plaintiff had legal representation, that he had filed two EEOC charges, summarized Plaintiff's alleged disability and then stated: "Manager Jeff Morley has refused to accommodate his reasonable restrictions". (Ex. 8). And finally, Plaintiff argues that this current lawsuit, which was filed on May 21, 2012 constituted a request for an accommodation from Defendant pursuant to the ADA and PWDCRA.

a.    PWDCRA

Pursuant to the PWDCRA, to bring a cause of action "for failure to accommodate in employment, the employee must advise the employer in writing of the need for accommodation." *Petzold v. Borman's Inc*., 241 Mich. App. 707, 716 (2000); *see* MICH. COMP. LAWS § 37.1210(18) (stating in relevant part, "[a] person with a disability may allege a violation against a person regarding a failure to accommodate under this article only if the person with a disability notifies the person in writing of the need for an accommodation within 182 days after the person with a disability knew or reasonably should have known that an accommodation was needed.").

In the instant case, Plaintiff notified Defendant on June 14, 2010 by a doctor's note that he needed an accommodation, but retracted that request the next day by submitting a doctor's note clearing him to work without restrictions. Plaintiff has not set forth anything in the record indicating that he submitted a request for an accommodation in writing to Defendant after the June 15, 2010 doctor's note clearing him to work. Plaintiff, himself, testified that he never requested another accommodation from Defendant. Further, even if the Court were to construe his first EEOC charge as written notice of him seeking an accommodation, that EEOC charge was filed some 239 days after he claimed he first needed the accommodation.

21

As Plaintiff failed to request an accommodation in writing within the statutorily required time period from Defendant, summary judgment for Defendant on Plaintiff's PWDCRA claim is appropriate.

> b.    ADA

 The Court must now address whether Plaintiff has established that he requested an accommodation from Defendant pursuant to the ADA.  It is unclear from the briefing if Plaintiff believes the aggregation of his initial doctor's note, the two EEOC charges, the attorney's letter, and this lawsuit gives rise to a request for a reasonable accommodation or if Plaintiff is arguing that one certain event viewed in the context of all the other facts constitutes a request for an accommodation.

The Sixth Circuit has recognized that in certain circumstances a request for an accommodation can be inferred from context.  *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004) (inferring a request for an accommodation from a letter authored by the plaintiff to her employer seeking a change in job duties in the context of a Rehabilitation Act claim).

Defendant has not set forth any particular formalities that Plaintiff must have followed pursuant to a policy or procedure to request an accommodation.  The record is clear that Plaintiff did in fact request an accommodation on June 14, 2010 which was retracted some 24 hours later with the submission of a doctor's note clearing Plaintiff for work with no restrictions.  There is also testimony from both Morley and Trongo that they did not know that Plaintiff had any medical restrictions or that he was still seeking an accommodation after June 15, 2010 (Morley Dep. 8/15/13 at 25; Trongo Dep. at 18-19).  However, Trongo testified that at least once over the course of two or three years Plaintiff stated that the boxes were too heavy to lift.  (Trongo Dep. at 18).  Also, Trongo had one conversation and Morley had two conversations with Plaintiff where they instructed him to get help unloading the truck.  Morley testified, however, that Plaintiff did not tell him why

he was having problems unloading the truck. (Morley Dep. 8/15/13 at 30-33).

The present facts are distinguishable from those in *Smith*, where the Sixth Circuit found that an accommodation could be inferred from the context of a letter. *Smith*, 376 F.3d at 535. In *Smith*, the employer was "well aware of Smith's disability and her need for a medical restriction on her hours of work" when she sent her employer a letter seeking to delegate some of her work to another employee. *Id*. In the present case, however, there is nothing in the record establishing that Defendant was "well aware" that Plaintiff had a disability or what accommodation Plaintiff sought from Defendant. Plaintiff's attorney's letter, dated the day this action was filed in state court, does not set forth what accommodation Plaintiff was seeking from Defendant. Rather, the letter merely set forth Plaintiff's medical conditions and that "Manager Jeff Morely has refused to accommodate his reasonable restrictions." (Ex. 8 at 1). The letter does not give any indication what those "reasonable restrictions" were. Plaintiff's EEOC Charges are bereft of any indication of what kind of disability Plaintiff suffered and similarly lacking any indication of what type of restriction or accommodation that Plaintiff was seeking from Defendant. (Ex. M, EEOC Charges). Further, Plaintiff's EEOC Charges contained dates of no significance. (*Id*. at 1). In fact, Plaintiff's *own testimony* is that he never requested an accommodation from Defendant after the June 14, 2010 doctor's note. (*See* Pl.'s Dep. 16-19). The last correspondence Morley received from Plaintiff regarding his ability to work was a doctor's note that specifically cleared Plaintiff to work with *no* restrictions. Finally, it remains unclear what exact accommodation Plaintiff is currently seeking. In his deposition Plaintiff stated he needed a 10 pound restriction, but the 2011 doctor's note (that was not submitted to Defendant prior to this litigation) and Plaintiff's Response brief stated that Plaintiff seeks a 20 pound lift restriction.

23

Plaintiff offers no legal analysis to buttress his argument that prior to the filing of this lawsuit the Defendant was aware of Plaintiff's need for a reasonable accommodation to sit when needed and to avoid "certain heavy lifting". (Pl.'s Br. at 8). Finally, to the extent Plaintiff appears to argue that the lawsuit itself can serve as a request for an accommodation to an employer such reasoning fails because Plaintiff is attempting to use his legal complaint filed on May 21, 2012 as evidence that he *previously* requested an accommodation. This argument is flawed.

Therefore, the Court finds that Plaintiff has failed to show that he requested an accommodation and as a result, Plaintiff cannot establish a *prima facie* case of failure to accommodate under the ADA.[9]

B.    Retaliation Claims

Defendant claims that Plaintiff cannot set forth a *prima facie* case of retaliation under either statute because Plaintiff cannot show that he suffered any adverse employment action. Further, Defendant claims that even if Plaintiff did suffer an adverse employment action, he has failed to show that there is a causal connection between an adverse action and the filing of his EEOC Charges in 2011.

The ADA prohibits a qualified employer from discriminating against an individual on the basis of disability. *See* 42 U.S.C. § 12203. Pursuant to the ADA's anti-retaliation provision, "an employer may not 'discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]'." *Carson v. Ford Motor Co*., 413 F. App'x 820, 822 (6th Cir. 2011) (quoting 42 U.S.C. §

---

[9] To the extent Plaintiff contends Defendant failed to engage in the "interactive process" as required pursuant to the ADA, such a requirement could not be triggered where Plaintiff never requested a reasonable accommodation from Defendant prior to the filing of this lawsuit. Therefore, the Court declines to address this issue.

24

12203(a)).  The Sixth Circuit recognizes that courts analyze ADA retaliation claims "using the same general framework as other statutory retaliation claims." *Id.*, (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 (6th Cir. 1999) (en banc) (noting that the "essential framework" of retaliation claims under the ADA, Title VII, NLRA and other statutes remains the same)).  Once a *prima facie* case has been established, the burden shifts "to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its actions." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008).

To establish a *prima facie* case of retaliation, Plaintiff must set forth that (1) he engaged in activity protected by the ADA, (2) the defendant knew of his exercise of his protected right, (3) the defendant then "took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment", and (4) there was a causal connection between Plaintiff's protected activity and the adverse employment action. *Johnson*, 344 F. App'x at 113 (citing *Barrett v. Whirlpool Corp.*, 556 F.3d 503, 516 (6th cir. 2009)); *see also Aho v. Dept. of Corrections*, 263 Mich. App. 281, 288 (Mich. Ct. App. 2004) (setting forth substantially similar factors to establish a *prima facie* case of retaliation pursuant to the PWDCRA).

The Court need not address whether Plaintiff has set forth evidence that he was subjected to an adverse employment action or "severe or pervasive retaliatory harassment."  Because even assuming *arguendo*, that Plaintiff suffered the required adverse employment action or severe harassment, Plaintiff's claim fails because he cannot establish a causal connection between any protected conduct and the alleged harassment.

Plaintiff appears to argue in his response brief that the protected conduct that he engaged in was giving Defendant his initial doctor's note on June 14, 2010 which set forth restrictions on lifting and stating he needed to sit every two hours.  (Ex. J).  Plaintiff also states that the retaliation

continued after he filed two charges with the EEOC in February, 2011.

Plaintiff fails to set forth any evidence of a causal connection between Trongo's or Morley's alleged harassing treatment of him and his submission of the June 2010 doctor's note or his filing of EEOC Charges. Rather, it is clear from the record that Plaintiff's complaints regarding his scheduling by Trongo began as early as 2008 and her harsh manner was universal to all meat employees beginning in at least 2008. Testimony of his co-worker Maraman further establishes that Trongo was "hard on everyone" and had been hard on Plaintiff since he started working in 2008. (Maraman Dep. at 10, 18-19, 24-25, 32). Maraman also testified that Trongo "disrespects all of [the meat workers] and tries to pick on all of us if she can get away with it." (Maraman Dep. at 25). Plaintiff, himself, admitted that Trongo yells at everyone in the department. (Pl.'s Dep. at 73-74). Further, although Plaintiff testified that Trongo yelled or harassed him "a little bit more than most", he goes on to explain that this is likely "[b]ecause I have been there a long period of time." (Pl.'s Dep. at 74, 103).

To the extent Plaintiff asserts that he was harassed by the store manager, Morley, Plaintiff's testimony contradicts this claim. Plaintiff specifically testified that Trongo was the only department head who he believed was harassing him or making an unfair schedule for him. (Pl.'s Dep. at 73-74).

There is also nothing in the record that establishes that Trongo or Morley were aware that Plaintiff had filed charges with the EEOC (Morley Dep. at 8/15/13 at 26; Trongo Dep. at 68), that he had filed this lawsuit (Trongo Dep. at 75; Morley Dep. 8/15/13 at 26-27), or that he was still seeking an accommodation after June 15, 2010 (Morley Dep. 8/15/13 at 25; Trongo Dep. at 18-19).

Finally, Plaintiff has set forth no evidence that connects the alleged harassing actions of Trongo (and the one alleged harassing action of Morley, cornering Plaintiff regarding unsold

26

product) to any protected conduct.  In fact, the record establishes that Plaintiff's complaints about his scheduling and his interactions with Trongo have remained consistent since at least 2008 – predating the alleged protected conduct by years.  Therefore, as Plaintiff cannot establish a *prima facie* case of retaliation under the ADA and the PWDCRA, summary judgment is appropriate.

## IV. CONCLUSION

For all the reasons set forth above, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 10).

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  December 12, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 12, 2014.


s/Deborah Tofil
Case Manager